In re EXCLUSIVE INDUSTRIES
CORPORATION, Debtor.

William C. SANDOZ, Trustee, Plaintiff,

v.

FIRST NATIONAL BANK OF LAFA-
YETTE, LA., Powell Lumber Company,
South Louisiana Saw Mill, Inc., Amco
Underwriters of Audubon Insurance
Co., and Elder Pallet and Lumber
Sales, Inc., Defendants.

Bankruptcy No. 428–00204–LO.
Adv. No. 483–0210.

United States Bankruptcy Court,
W.D. Louisiana.

May 15, 1984.

Wayne A. Shullaw, Lafayette, La., for First Nat. Bank.

George W. McHugh, Jr., St. Martinville, La., for South La. Sawmill, Inc.

James C. Lopez, Opelousas, La., for Elder Pallet and Lumber Sales, Inc.

Joseph A. Schittone, Jr., Baton Rouge, La., for Amco Underwriters of Audubon Ins. Co.

William C. Sandoz, Opelousas, La., trustee for Exclusive Industries Corp., debtor.

## OPINION

RODNEY BERNARD, Jr., Bankruptcy Judge.

### Procedure

Exclusive Industries Corporation filed for relief under Chapter 7 of the United States Bankruptcy Code on April 8, 1982. The present matter is before this court as an adversary proceeding commenced by the trustee against three creditors claiming vendors privileges, Elder Pallet and Lumber Sales, Inc. (Elder); South Louisiana Sawmill, Inc., (S.L.S.M.); Powell Lumber Company (Powell); and two creditors claiming mortgages, Amco Underwriters of Audubon Insurance Company (AMCO), and First National Bank of Lafayette (F.N.B. L.), on the proceeds of a sale of certain assets of the estate. The trustee seeks by this action to have the court determine the validity and ranking of these various privileges and mortgages.

### Findings of Fact

Pursuant to an order of this court on April 26, 1982, the trustee sold the entire 'boardroad' inventory of the debtor, Exclusive Industries Corporation. This was a private sale, conducted at various locations around the state, and which yielded One Hundred Ninety Thousand Five Hundred Sixty-Nine and 80/100 ($190,569.80) in proceeds; the particulars of that sale may be summarized as follows:

| Company | Job Location | Parish | Board Ft. Bundled | Board Ft. Flat on Down on Location |
|---|---|---|---|---|
| Eico Yard | Lafayette | Lafayette | 741,320 | None |
| Inexco | Prairie Rhonde | St. Landry | 210,000 | 351,777 |
| Getty Co. | St. Martinville | St. Martin | None | 970,988 |
| Stone Co. | Bayou Blue | Terrebonne | 245,000 | 1,298,656 |
| Fonseca | Raceland | LaFourche | 100,800 | None |
| Inexco | Baldwin | St. Martin | 280,000 | None |
| Getty | Palmetto | St. Landry | 51,800 | 14,000 |
| Elder Property | Palmetto | St. Landry | 100,000 | None |
| Getty | Houma | Terrebonne | 315,000 | 530,102 |
| Getty | Erath | Vermilion | 456,400 | None |
| Stone | Pecan Island | Vermilion | 245,000 | 598,360 |
| Weaver | Raceland | LaFourche | None | 667,716 |
| Penn Oil (Pend Orcille) | Addis | W. Baton Rouge | None | 493,024 |
| L.L. & E. | Opelousas | St. Landry | None | 84,000 |
| Inexco | Pine Prairie | Evangeline | None | 577,906 |
| Inexco | Palmetto | St. Landry | None | 137,920 |
| | Total | | 2,745,320 | 5,724,449 |

Grand Total $8,469,769 board feet at $22.50 per thousand=
Dollar Total $ 190,569.80

---

Prior to the trustee's sale, three of the defendants, Elder, S.L.S.M., and Powell had all filed claims in the Chapter 7 proceeding each claiming to have a vendor's privilege over respective portions of the 'boardroad' inventory. They claim these privileges as a result of sales of lumber made by them to the debtor for which they were not paid. Powell did not appear at the hearing nor did it produce any evidence in support of it's claim. The remaining two defendants claiming vendor's privileges take the position that a portion of the proceeds from the trustee's sale of lumber is directly attributable to the lumber the defendants sold to the debtor and for which they have not been paid. Accordingly, they argue that their vendor's privilege attaches to these proceeds attributable to that unpaid-for stock of lumber. Further, they in essence make the argument that: (1) since it is known what percentage of the total lumber sold by the trustee is attributable to the deliveries of lumber made by each of the two defendants to the debtor respectively; and (2) since the trustee sold the entire stock of lumber on a single unitary price basis, it then requires only a simple mathematical calculation to determine what portion of the proceeds should go to each of them. Specifically they would have the court merely multiply that percentage figure times the total proceeds to arrive at the amount to which their respective vendor's privileges will attach.

Both of the remaining defendants claim to have valid chattel mortgages affecting all or substantial portions of the 'boardroad' inventory sold by the trustee. In turn, they assert that their rights under their respective mortgages attach to the proceeds of that sale. First National Bank of Lafayette (F.N.B.L.) accepted a mortgage on September 9, 1981 which was subsequently recorded in all sixty-four (64) parishes. It is F.N.B.L.'s contention that on the date of the sale the mortgage secured a debt owed to them by the debtor in the amount of Two Hundred Ten Thousand Five Hundred Thirty-One and 48/100 ($210,531.48) Dollars. The property covered by the F.N.B.L. mortgage is described in the mortgage instrument as follows:

All of the masses or assemblages and inventory of lumber and materials (boardroad lumber inventory generally measuring $3'' \times 8'' \times 10'$–$16'$ and all other materials utilized in the construction

of boardroads) and all other items of inventory, and equipment contained, *and to be kept at mortgagor's place of business located at 2404 N. University (Highway 182 North) Lafayette, Louisiana,* it being intended that this mortgage shall constitute a Bulk Chattel Mortgage within the meaning of LSA R.S. 9:5351 et seq; and a Mortgage of Movable Used in Commercial or Industrial Activity within the meaning of LSA R.S. 9:5367 et seq., relating to all items kept on the premises and all replacements thereof;

Mortgagor hereby warrants and represents that the inventory of Boardroad lumber mortgaged herein is generally utilized by mortgagor in the construction of boardroads in the State of Louisiana. Mortgagor further warrants and represents that the property mortgaged herein will not be removed from the State of Louisiana without the prior consent of mortgagee. (emphasis added)

The mortgage held by the remaining defendant, AMCO, on the other land, was executed on November 20, 1981. On the date of sale, it is proported to have secured a debt of One Hundred Sixty Nine Thousand Five Hundred Thirty-Five and 65/100 ($169,535.65) Dollars then owed by debtor to AMCO. AMCO holds its mortgage under an assignment from Hub City Insurance Agency, Inc., (mortgagee), who is not a party to this action. No one has raised any questions as to the validity or effectiveness of that assignment and indeed there appears to be no reason to doubt that AMCO has, for our purposes, stepped into the shoes of its assignor, Hub City. The property covered by the AMCO mortgage is described in that mortgage instrument as follows:

That certain mass or assemblage of all new and/or used oil field lumber of various sizes constituting mortgagor's entire revolving stock of lumber, now owned and/or hereafter acquired by mortgagor, being used and/or to be used for board roads and/or oil field related construction activities, *being located in various parishes* of the State of Louisiana, including the Parish of *Lafayette,* the Parish of *Terrebonne,* the Parish of *Vermilion,* the Parish of *Lafourche,* the Parish of *St. Helena,* and the Parish of *Acadia,* and *at Mortgagors principal place of business* situated on Louisiana Highway 182 North, Lafayette, Louisiana. (emphasis added)

AMCO concedes that the F.N.B.L. mortgage was executed and recorded first in time, and that normally this would mean that F.N.B.L.'s mortgage would prime their own. However, AMCO argues that the F.N.B.L. mortgage contains a defective description and that as a consequence the AMCO mortgage should prime, allowing for the sole exception of the lumber actually physically located in Lafayette Parish at the time of the sale.

### Discussion and Conclusions of Law
#### The Vendors Privileges:

As indicated above, three of the defendants, Elder, S.L.S.M. and Powell, each claims to have a vendor's privilege over a respective portion of the sale proceeds resulting from unpaid for deliveries of lumber made by them to debtor.

Louisiana law gives a vendor of movable property a preference and privilege for his price over the property sold. *LSA C.C. Article 3227.* This vendor's privilege arises automatically as a matter of law and does not depend upon recordation. *Weiss v. Hudson Const. Co.* 151 La. 1, 91 So. 525 (1922); *Matter of Tape City,* 677 F.2d 401 (5th Cir.1982). The privilege lasts as long as the price remains unpaid and the property remains in the possession of the vendee. *Lobe Automatic Sprinkles v. Bell,* 183 La. 937, 165 So. 150 (1936). For the purposes of bankruptcy, the debtor/vendee is not considered to have 'lost possession' on the mere filing of his petition, and accordingly, the privilege is recognized in bankruptcy as a secured claim. *Matter of Tape City,* 677 F.2d 401 (5th Cir.1982).

A vendor claiming a vendor's privilege has the burden of establishing its ex-

istence. *Hemenway Furniture Co. v. Lindsay* 161 So. 27 (La.App.1935). Powell Lumber Company failed to appear at the hearing or to produce any evidence of its claim, accordingly its claim must be denied.

 Additionally, where as here, the vendor attempts to claim the privilege from the proceeds of a consummated sale, "... he must not only prove the existence of his privilege but also the amount to which he is entitled". *La.State Emp. Retirement v. Campo Rlty.*, 380 So.2d 1377, 1379 (La. App.4th Cir.1979). In that same regard, it thus becomes imperative that La. *C.C. Art. 3227*, granting the privilege, not be read in isolation but instead it must, indeed as the civil code commands,[1] be read 'in pari materia' with the articles which follow it. Specifically *Art. 3228* provides:

> But if he allows the things to be sold, confusedly with a mass of other things belonging to the purchaser, without making his claim, he shall lose the privilege, because it will not be possible in such a case to ascertain what price they brought.

LSA *C.C.Art. 3228* (emphasis added)

Likewise *Art. 3230* provides:

> When the things reclaimed consist in merchandise, which is sold in bales, packages, or cases, the claim shall not be admitted if they have been untied, unpacked or taken out of the cases and mixed with other things of the same nature belonging to the purchaser, so that their identity can no longer be established.

LSA *C.C.Art. 3230*

This court finds that when the three articles are read together the clear thrust is to the effect that the vendor claiming the privilege must overcome a rather exacting burden of proof in order to prevail on claims as these presently before the court. First, the claimant should be able to identify the property on which he claims the privilege with a great deal of specificity or at least to the point where it might be readily segregated from the remainder of the 'mass' being sold. Next, he must be able to demonstrate the price that his items, as opposed to the other items comprising the 'mass', brought at the sale. The court further, finds the Louisiana jurisprudence to be in complete and consistant agreement with the preceeding codal interpretation. This line of jurisprudence was in fact aptly summarized by the Louisiana 4th Circuit of Appeals in the case of *Louisiana State Emp. Retirement v. Campo Realty*. 380 So.2d 1377, 1378 (La.App. 1979) wherein that court stated:

> A longstanding line of jurisprudence in Louisiana has applied this article, [C.C. 3228], in situations like the present one to hold that the vendor's privilege is lost when the holder of the privilege allows the movables to be sold in a lump along with other items without separate appraisement. *Campo* (supra); see also cases cited therein.

 Again, another Louisiana appellate court in the case of *Phillips v. Conley,* 46 So.2d 650 (La.App.2d Cir.1950), after explaining the stricti juris nature of privileges as the policy supporting the rule, pronounced as follows:

> "It is a fundamental principal of law that in order to enforce a Vendor's Lien against movable property the identity of such property must be possible of establishment; and that if such identity be lost by uniting or commingling the effective (sic.) movable with another movable (or in some cases with an immovable), the lien and privilege is automatically destroyed. It no longer exists. *For the preservation of the lien and privilege, it must be possible for one, so to speak, to be able to put his hands on the specific object that was sold,* and have the ability to separate it unimpaired from

---

1. As was pointed out in the various briefs submitted by the parties on this matter the cases supporting this interpretation are manifold: see e.g. *Monticello v. Delavisio,* 191 So. 162 (La.App. 1939); *Bender v. Davis Cash Store,* 163 So. 170 (La.App.1935); *Newman v. Cannon,* 33 La.App. 712, 9 So. 439 (La.1891) *Brittain v. Olla Lumber Co.,* 5 La.App. 501 (1927)—For a fuller collection of such cases see LSA CC Arts. 3228, 3230 and annotations listed thereunder.

other objects or things which it may be associated or to which it may be attached." *Phillips* (supra), 652 (emphasis added); [2]

This court views Elder's attempts to distinguish these cases and the solid jurisprudential foundation upon which they stand from the present factual situation before the court, as persuasive but unconvincing. For instance, Elder would have this court distinguish *Phillips* (supra) on the factual basis that the case dealt with natural gas, a substance more difficult to identify than the lumber now in question. Whereas the court can readily conceive of factual situations in which dissimilarities in the respective physical properties of gas as opposed to lumber might supply a basis for distinguishment, nevertheless, the court finds no cause for such a distinction based on the facts presently before the bar. The claimant in *Phillips*, much like the claimants here, attempted to prove their case by showing that the gas delivered by them formed a definite and discreet percentage of the total gas stocks then in the hands of the debtor; the *Phillips* court rejected this proof as insufficient. This court likewise finds such proof inadequate and finds that when such is the manner of proof it makes little difference whether we are counting angles or atoms, both being equally difficult to discern by the unaided senses. The point is that neither S.L.S.M. or Elder has demonstrated to the satisfaction of this court the identity of the property over which the privilege is claimed beyond a mere conjecture as to a percentage of the total 'boardroad' inventory. Accordingly the claimants have clearly failed to meet the test of identity as set out in the above cited jurisprudence. From a purely factual viewpoint also, this case demonstrates the wisdom of the policy supporting that test. The testimony reveals that the vendees' lumber was commingled not only with that of one another but also with lumber already belonging to the debtor in full ownership. The testimony further shows that the inventory consisted of both old and new lumber and that the entire inventory was gradually reduced by loss due to breakage following delivery by vendors until the time of sale. Under such circumstances it is impossible for this court to determine how much of each respective vendor's lumber was actually included in the sale or what price each individual portion brought at that sale. There is certainly no reason to presume that the loss due to breakage was equally distributed or that the quality of the lumber, both old and new bore equally upon the ultimate price.

Lastly, Elder's argument 'ab absurdum', which would have this court disregard the clear and unambigious wording of LSA C.C.*3228* and *3230* in favor of what it, Elder, denominates as a more "practical reading" is clearly incorrect. Not only would such an interpretation violate the very first tenet of Codal construction as proclaimed in LSA CC.Art. *13:*

When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit;

but it simply would not square with the factual realities of the matter presently before the court. More precisely, far from finding the result obtained by a strict adherence to the aforementioned code articles, to be absurd, the court finds that result to be the only fair and equitable one possible under the instant facts. After all, as the preliminary civil code articles treating "of privileges" clearly indicate, privileges are to be viewed as exceptional and in degrogation of the general rule that all of the property of the debtor is the common pledge of his creditors to be shared by them equally. LSA C.C.Art. *3182*, et seq. It is quite natural then, that the Codal provisions regulating privileges should be subject to strict construction and that claims not falling squarely within these provisions should be refused admittance. LSA C.C.Arts. *3185, 3228, 3230; Phillips*

---

**2.** Laws 'in pari materia' or upon the same subject matter, must be construed with a reference to each other; what is clear in one statute may be called in aid to explain what is doubtful in another. *LSA C.C. Art. 17*

(supra). This court can find no reason why these vendors having failed to take the necessary steps to preserve their claim, having allowed the sale to take place without separate appraisal, and having allowed their lumber to become commingled with that of the debtor as well as one another's, should now be placed in a position of preference above the other unsecured creditors. It is for these reasons that the court must and does reject the claims of Elder, Powell, and S.L.M.S. to a vendor's privilege on any portion of the proceeds of the trustee's sale.

*Chattel Mortgages*

■ Under Louisiana law in order to secure an obligation, the obligor, as an accessory obligation, may grant a chattel mortgage over "any and every kind" of his movable property, including "masses or assemblages of things". LSA *R.S. 9:5351* et seq. Such a mortgage must be in writing, contain a proper description of the affected property and becomes effective against third parties, including subsequent mortgagees, upon filing for recordation in the proper office. LSA *R.S. 9:5352, 5354.* As to what constitutes a proper description of the property affected by the mortgage, the Louisiana Revised Statutes provide in pertinent part as follows:

A. Every chattel mortgage shall be in writing and the obligation secured there shall be described

. . . . .

A chattel mortgage granted on any mass or assemblage of things ... shall describe the same as all of a particular class or classes or grade or kind or type or species or dimensions or as a stock of merchandise to be kept at a certain location. *In all other cases a full description of the property* to be mortgaged shall be set forth so that it may be identified *and its location* shall be stated; *provided, that the failure to recite the location of the chattel shall not affect the validity of the mortgage.*

B. . . .

LSA *R.S. 9:5352* (emphasis added)

What is important here, (as can be seen from the description given in the F.N.B.L. mortgage reproduced earlier in this opinion), is that F.N.B.L.'s mortgage although purporting to cover the whole of the 'boardroad inventory' gives as a location "mortgagor's place of business located at 2404 N. University (Highway 182 North) Lafayette". AMCO on that basis contends that F.N.B.L.'s mortgage extends only to the lumber actually physically located in the parish of Lafayette on the date of sale. F.N.B.L. for its part has countered that any possible defect in the description was cured by subsequent recordation in every parish of the state. To quote F.N.B.L.'s brief: "In the case at hand, the mortgagor and mortgagee both recognized that the boardroad lumber would be used throughout the state of Louisiana. Therefore, the mortgage was recorded in all 64 parishes." Additionally F.N.B.L. contends that even if the description were faulty, the last sentence of *9:5352* provides that a mortgage will not be held invalid for failure to state a location. Taking the latter first, the court finds that a natural and unstrained reading of the above cited statute does not lead to the result suggested by F.N.B.L. The saving phrase to which F.N.B.L. points is contained in an entirely different sentence from that portion of the statute dealing with 'masses or assemblages'. Furthermore the sentence containing the phrase begins "In all other cases", which it is felt, indicates a clear legislative intent to exclude mortgages over 'masses or assemblages' from the provisions of the last sentence. In this regard the court agrees with AMCO wherein it argues that the policy reasons supporting such a distinction are obvious. As AMCO points out, *9:5352* requires that property comprising a 'mass or assemblage' be described only in general terms whereas "in all other cases" (i.e. specific items of property), the statute requires a "full description". Thus, location, provides a much more important and necessary part of the description when dealing with mortgages covering 'masses or assemblages' than it does in the case of specific items of property which must be described

in full. The court is aware of the language contained in *In re Caldwell Port Elevator, Inc.* 23 B.R. 154 (Bkrtcy.W.D.La.1982), decided by another bankruptcy court in this district, and cited by F.N.B.L. in brief as suggesting a contrary result. That case however dealt chiefly with the issue of the retroactive effect of the amendment to *9:5352* which added the phrase in question and gives little indication as to the specifics of the mortgage or description at issue therein; as such this court finds that case to be of little assistance in resolving the questions presently before us. But, to the extent that the result reached in *Caldwell* is inconsistent with that reached here today, this court would respectfully disagree with *Caldwell* (supra).

█ Finally, to the question of the adequacy of the description contained in the F.N.B.L. mortgage, resting on its own terms. Louisiana law is to the effect that the sufficiency of description depends upon the particular circumstances surrounding each individual case. The test to be applied in such an evaluation is, did the description sufficiently put third parties on notice of the mortgage and of the property affected by it? *Domengeaux v. Daniels* 401 So.2d 655 (La.App.3d Cir.1981). The description need not be so complete as to make identification possible solely from the words of the written instrument itself but must at least be sufficient to put third parties on notice to make reasonable inquiries regarding property possibly affected by the mortgage. *Smith v. Bratsos,* 202 La. 493, 12 So.2d 245 (1943). The key is that the adequacy of the description must be judged objectively through the eyes of a fictional "reasonable" third party. F.N.B.L. however, in its brief makes only the curious argument that "in the case at hand, the mortgagor and the mortgagee both recognized that the boardroad lumber would be used throughout the State of Louisiana". And therein lies the rub, for it is not the mortgagor's or mortgagee's curiosity that need be aroused but that of our "reasonable third party". *Domengeaux* (supra) *Smith* (supra). Under the instant facts this court finds that there is nothing contained in the subject description which would put a "reasonable third party" on notice that property described as being located in Lafayette Parish is actually located in several parishes throughout the state. Nor is that defect in description cured by the recordation of that same said mortgage containing that same said description in the other parishes throughout the state. F.N.B.L.'s reliance on *Young v. Squeeze Tool, Inc.,* 350 So.2d 967 (La.App.2d Cir.1977) is misplaced. That case dealt not with the mortgage of a 'mass or assemblage' of things but with a specific piece of property, namely a portable drilling rig which was incidentally the only drilling rig owned by the mortgagor in that case. Under such circumstances, as discussed above, the statement of location takes on a lesser importance, as it is the description of the property itself which should trigger further inquiry. Unfortunately the same cannot be said of the description of the lumber in question, which is cast in general terms, and which necessarily depends on the statement of location to complete the description.

█ Additionally, the F.N.B.L. mortgage does state a location albeit a partially incorrect or incomplete location. The Louisiana jurisprudence has made a distinction regarding inaccurate descriptions as opposed to missing descriptions; and as might be expected has taken a dimmer view as to the former. This distinction was explained in the case of *Auto Paint & Supplies Co., Inc. v. Hale,* 408 So.2d 346 (La.App.3d Cir.1981) as follows:

"We conclude that it is the absence or omission of identifying information ... which under certain circumstances, triggers the requirement of further inquiry by third persons. On the other hand, if the mortgage document purports to provide an accurate and complete description of the mortgaged property, good faith third party purchasers need not make further inquiry. *Hale* (supra), 351; writ denied 412 So.2d 1112; See also: *Burglass v. Manfre* 168 So. 328 (La.App. 1936); *Williams v. Miller* 160 So. 165

(La.App.1935); *In re Hidalgo* 96 F.Supp. 783 (D.C.W.D.La.1951).

Likewise here the court finds that the description contained in the F.N.B.L. mortgage not only fails to trigger reasonable inquiry by third parties regarding property outside of Lafayette Parish but by its language lulls the unsuspecting into a false sense that the mortgage covers only property located in that parish. It is a well recognized principle of law in Louisiana that security devices are to be considered stricti juris and in degrogation of the general rule that property is to be divided pro rata among the creditors. *42 LLR 413 Rubin:* "Security Devices"; LSA *C.C. Arts 3182* et seq; *Phillips* (supra). Accordingly, to be effective as against third parties, security devices must be properly drafted and perfected. *42 LLR 413* (supra). Third parties are entitled to assume the recitals contained in the mortgage are correct; any ambiguity or omission must be construed against the existence of the mortgage and in favor of the third party. Accordingly and for all of the foregoing reasons stated the F.N.B.L. mortgage will be recognized only to the extent of the lumber actually and physically located in the parish of Lafayette on the date of the trustee's sale.

By contrast, as can be seen from the description given earlier, the AMCO mortgage specifically lists several parishes as the locations of the lumber affected by its mortgage. Among the parishes listed in the AMCO mortgage are LaFourche, Terrebonne and Vermilion, all of which were subsequent sites for parts of the trustee's sale. Accordingly AMCO is entitled to a first claim to the proceeds from the sale of lumber located at: the Stone Company jobsite, Bayou Blue; the Fonseca jobsite, Raceland; the Getty site, Houma; the Getty site, Erath; the Stone Oil Company jobsite, Pecan Island and the Weaver jobsite, Raceland. Accordingly, the court finds that AMCO has a first claim which will attach to $100,283.26 of the total proceeds of the subject sale.

Similarly F.N.B.L. has a first claim on the proceeds resulting from the sale of lumber located at the Eico yard, Lafayette on the date of sale. Therefore, F.N.B.L. will be recognized as having a first claim which attaches to $16,679.75 of the total proceeds of the trustee's sale. All other claims asserted are hereby denied recognition.

Judgment will be signed in accordance with the foregoing findings and conclusions.